JS 44  - CAND  (Rev. 11/04)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

**I.(a) PLAINTIFFS**

Jose Guido

**DEFENDANTS**

Lt. David Sepulveda; Edward Flores; Anthony M. Aiello; Julie Myers; Michael Chertoff; Alberto Gonzales

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

Santa Clara (in government custody)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Robert B. Jobe, Law Office of Robert B. Jobe, 550 Kearny St., Ste. 200, SF CA 94108 (415) 956-5513

ATTORNEYS (IF KNOWN)

US Attorneys Office, 450 Golden Gate Ave., 11th Fl., San Francisco, CA 94102

**II. BASIS OF JURISDICTION** (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☑ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF
(For diversity cases only)                AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN**          (PLACE AN "X" IN ONE BOX ONLY)

☑ Original Proceeding

☐ Removed from State Court

☐ Remanded from Appellate Court

☐ Reinstated or Reopened

☐ Transfered from Another district (specify)

☐ Multidistrict Litigation

☐ Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT**  (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐610 Agriculture | ☐422 Appeal 28 USC 158 | ☐400 State Reapportionment |
| ☐120 Marine | ☐310 Airplane | ☐362 Personal Injury Med Malpractice | ☐620 Other Food & Drug | ☐423 Withdrawal 28 USC 157 | ☐410 Antitrust |
| ☐130 Miller Act | ☐315 Airplane Product Liability | ☐365 Personal Injury Product Liability | ☐625 Drug Related Seizure of Property 21 USC 881 | | ☐430 Banks and Banking |
| ☐140 Negotiable Instrument | ☐320 Assault Libel & Slander | ☐368 Asbestos Personal Injury Product Liability | ☐630 Liquor Laws | **PROPERTY RIGHTS** | ☐450 Commerce/ICC Rates/etc. |
| ☐150 Recovery of Overpayment & Enforcement of Judgment | ☐330 Federal Employers Liability | | ☐640 RR & Truck | ☐820 Copyrights | ☐460 Deportation |
| ☐151 Medicare Act | ☐340 Marine | **PERSONAL PROPERTY** | ☐650 Airline Regs | ☐830 Patent | ☐470 Racketeer Influenced and Corrupt Organizations |
| ☐152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐345 Marine Product Liability | ☐370 Other Fraud | ☐660 Occupational Safety/Health | ☐840 Trademark | ☐810 Selective Service |
| | ☐350 Motor Vehicle | ☐371 Truth In Lending | ☐690 Other | | ☐850 Securities/Commodities/Exchange |
| ☐153 Recovery of Overpayment of Veteran's Benefits | ☐355 Motor Vehicle Product Liabiltiy | ☐380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐875 Customer Challenge 12 USC 3410 |
| ☐160 Stockholders Suits | ☐360 Other Personal Injury | ☐385 Property Damage Product Liability | ☐710 Fair Labor Standards Act | ☐861 HIA (1395ff) | ☐891 Agricultural Acts |
| ☐190 Other Contract | | | ☐720 Labor/Mgmt Relations | ☐862 Black Lung (923) | ☐892 Economic Stabilization Act |
| ☐195 Contract Product Liability | | | ☐730 Labor/Mgmt Reporting & Disclosure Act | ☐863 DIWC/DIWW (405(g)) | ☐893 Environmental Matters |
| ☐196 Franchise | | | ☐740 Railway Labor Act | ☐864 SSID Title XVI | ☐894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐790 Other Labor Litigation | ☐865 RSI (405(g)) | ☐895 Freedom of Information Act |
| ☐210 Land Condemnation | ☐441 Voting | ☐510 Motion to Vacate Sentence Habeas Corpus: | ☐791 Empl.Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐220 Foreclosure | ☐442 Employment | ☑530 General | | ☐870 Taxes (US Plaintiff or Defendant | ☐950 Constitutionality of State Statutes |
| ☐230 Rent Lease & Ejectment | ☐443 Housing | ☐535 Death Penalty | | ☐871 IRS - Third Party 26 USC 7609 | ☐890 Other Statutory Actions |
| ☐240 Torts to Land | ☐444 Welfare | ☐540 Mandamus & Other | | | |
| ☐245 Tort Product Liability | ☐440 Other Civil Rights | ☐550 Civil Rights | | | |
| ☐290 All Other Real Property | ☐445 Amer w/ disab - Empl | ☐555 Prison Condition | | | |
| | ☐446 Amer w/ disab - Other | | | | |
| | ☐480 Consumer Credit | | | | |
| | ☐490 Cable/Satellite TV | | | | |

**VI. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

8 U.S.C. § 1226(c); 28 U.S.C. § 2241

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $☐ CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES  ☑ NO

**VIII. RELATED CASE(S) IF ANY**    PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

**IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)**
(PLACE AND "X" IN ONE BOX ONLY)    ☑ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE  7/25/07

SIGNATURE OF ATTORNEY OF RECORD

1   Robert B. Jobe (Cal. State Bar #133089)
    LAW OFFICE OF ROBERT B. JOBE
2   550 Kearny Street, Suite 200
    San Francisco, CA 94108
3   (415) 956-5513 (phone)
    (415) 840-0308 (fax)
4
    Attorney for Petitioner,
5   Jose Guido.

6

**ORIGINAL FILED**

JUL 2 7 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7              UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA         MJJ

9               SAN FRANCISCO DIVISION

10
    JOSE GUIDO,                         No. C 07 3873
11
12          Petitioner,

13              v.

14   LT. DAVID SEPULVEDA, JAIL                PETITION FOR WRIT OF
     ADMINISTRATOR, SANTA CLARA            HABEAS CORPUS PURSUANT
15   COUNTY DEPARTMENT OF                  TO 28 § U.S.C. § 2241
     CORRECTION; EDWARD FLORES,
16   CHIEF OF CORRECTION, SANTA
     CLARA COUNTY DEPARTMENT OF
17   CORRECTION; ANTHONY M. AIELLO,
     ASSISTANT FIELD OFFICE DIRECTOR,
18   SAN FRANCISCO DISTRICT OFFICE,
     U.S. IMMIGRATION AND CUSTOMS
19   ENFORCEMENT; JULIE MYERS,
     ASSISTANT SECRETARY, U.S.
20   IMMIGRATION AND CUSTOMS
     ENFORCEMENT; MICHAEL
21   CHERTOFF, SECRETARY,
     DEPARTMENT OF HOMELAND
22   SECURITY; ALBERTO GONZALES,
     ATTORNEY GENERAL, UNITED
23   STATES,

24          Respondents.

25

26

27

28   Petition for Writ of Habeas Corpus

1

2

### **TABLE OF CONTENTS**

3   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4   JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5   VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

6   INTRADISTRICT ASSIGNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7   PETITIONER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8   RESPONDENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

9   STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

10  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

11       I.    THE PLAIN LANGUAGE OF § 1226(c)(1) LIMITS MANDATORY
12             DETENTION TO ALIENS WHO, AFTER OCTOBER 8, 1998, ARE
               "RELEASED" FROM CUSTODY FOR AN "OFFENSE" WHICH
               RENDERS THE ALIEN INADMISSIBLE OR DEPORTABLE, AND
13             THE BIA ERRED IN FINDING TO THE CONTRARY . . . . . . . . . . . . . . . . . 11

14       II.   IN DETERMINING WHETHER MR. GUIDO "IS DEPORTABLE"
15             BECAUSE OF HIS AUGUST 2003 MISDEMEANOR CONVICTION
               UNDER CAL. PENAL CODE § 290(a)(1)(D), THE BOARD APPLIED
               AN INCORRECT LEGAL STANDARD AND VIOLATED MR.
16             GUIDO'S FIFTH AMENDMENT RIGHT TO DUE PROCESS . . . . . . . . . . . 16

17               A.   The *Joseph* Standard – Which Allows a Lawful Permanent
18                    Resident to Avoid Mandatory Detention "Only" If He Can
                      Convince the IJ That the Government Is Substantially Unlikely
                      to Establish the Charge or Charges That Subject the Alien to
19                    Mandatory Detention – Is Blatantly Unconstitutional . . . . . . . . . . . . . . 16

20                        1.   Affected Interest of the Individual . . . . . . . . . . . . . . . . . . . . . . . 20

21                        2.   Risk of Error and Probable Value of Additional Safeguards . . . 21

22                        3.   Governmental Interest And Potential Burden . . . . . . . . . . . . . . 23

23               B.   To Avoid the Serious Due Process Concerns Described Above,
                      the Court Must Construe the Term "is Deportable" in § 1226(c)
24                    as Encompassing Only Those Aliens Who Have No Substantial
                      Argument Against The Charges of Removability That Trigger
25                    Mandatory Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

26

27

28

III.    BECAUSE THE ATTORNEY GENERAL DID NOT TAKE HIM INTO CUSTODY UNTIL YEARS AFTER HIS ARREST AND RELEASE ON HIS MISDEMEANOR CHARGE UNDER CAL. PENAL CODE § 290(a)(1)(D), MR. GUIDO IS NOT SUBJECT TO MANDATORY DETENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

*Addington v. Texas*,
    441 U.S. 418 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 22, 24

*Braden v. 30th Judicial Circuit Court of Kentucky*,
    410 U.S. 484 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Chaunt v. United States*,
    364 U.S. 350 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*Cooper v. Oklahoma*,
    517 U.S. 348 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 20

*Demore v. Kim*,
    538 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Flores-Chavez v. Ashcroft*,
    362 F.3d 1150 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 26

*Foucha v. Louisiana*,
    504 U.S. 71 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Gonzalez v. O'Connell*,
    355 F.3d 1010 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 25

*In re Guerra*,
    24 I & N Dec. 37 (BIA 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*In re Joseph*,
    22 I & N Dec. 799 (BIA 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Kotliar*,
    24 I & N Dec. 124 (BIA 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Winship*,
    397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*INS v. St. Cyr*,
    533 U.S. 289 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Robledo-Gonzalez v. Ashcroft*,
    342 F.3d 667 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Santiago v. U.S. I.N.S.*,
    134 F. Supp. 2d 1102 (N.D. Cal 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Santosky v. Kramer*,
    455 U.S. 745 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Tijani v. Willis*,
    430 F.3d 1241 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Salerno*,
    481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Vasquez v. Reno*,
    233 F.3d 688 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Woodby v. I.N.S.*,
    385 U.S. 276 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 22, 24

*Yi v. Maugans*,
    24 F.3d 500 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**STATUTES**

**Immigration & Nationality Act**

INA § 236(c)(1), 8 U.S.C. § 1226(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

INA § 236(c)(1)(B), 8 U.S.C. § 1226(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

INA § 236(c)(2), 8 U.S.C. § 1226(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 9, 12

**Other Federal Statues**

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**CODE OF FEDERAL REGULATIONS**

8 C.F.R. § 1.l(p) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

8 C.F.R. § 1003.19(h)(2)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10, 16

**STATE STATUTES**

Cal. Penal Code § 288(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Cal. Penal Code § 290 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 10

Cal. Penal Code § 290(a)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Cal. Penal Code § 290(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 16

**LAW REVIEW ARTICLES**

Bhargava, Shalina, "Detaining Due Process: The Need for Procedural Reform in
"*Joseph*" Hearings After *Demore v. Kim*," 31 N.Y.U. Rev. L. & S. Change 51 (2006) . . . . . . . . 4

1    Petitioner, Jose Guido ("Mr. Guido"), hereby petitions this Court for a writ of habeas

2    corpus to remedy his unlawful detention by Respondents. In support of this petition, Mr. Guido

3    alleges as follows:

## INTRODUCTION

5    This petition for writ of habeas corpus concerns the proper scope of § 236(c) of the

6    Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(c), "commonly known as the INA's

7    'mandatory detention' provision." *Tijani v. Willis*, 430 F.3d 1241, 1244 (9th Cir. 2005)

8    (Tashima, J., concurring). That provision directs "the Attorney General to "take into custody

9    any alien who," *inter alia*, "*is deportable* by reason of having committed any offense covered in"

10    INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii),[1] or INA § 237(a)(2)(A)(iii), 8 U.S.C. §

11    1226(a)(2)(A)(iii),[2] *"when the alien is released*, without regard to whether the alien is released

12    on parole, supervised release, or probation, and without regard to whether the alien may be

13    arrested or imprisoned again for the same offense." (Emphasis added). Aliens who are subject

14    to mandatory detention under § 1226(c) are ineligible for release during the pendeny of their

15    removal proceedings unless "certain strict conditions are met." *In re Rojas*, 23 I & N Dec. 117,

16    119 (BIA 2001), *citing* 8 U.S.C. § 1226(c)(2).

17    "[A] detainee who claims that he is not covered by § 1226(c)" is given a hearing at which

18    he "may avoid mandatory detention by demonstrating that he . . . was not convicted of a predicate

19    crime, or that the [government] is otherwise *substantially unlikely* to establish that he is in fact

20    subject to mandatory detention." *Demore v. Kim*, 538 U.S. 510, 514 n.3, 523 n.6 (2003)

21    (emphasis added); *see also* 8 C.F.R. § 1003.19(h)(2)(ii). In *In re Joseph*, 22 I & N Dec. 799

22    (BIA 1999), the Board of Immigration Appeals ("the BIA" or "the Board") opined that the

23    government's allegation that an alien "is deportable" for reasons that would justify mandatory

---

24

25    [1] INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii), provides that "[a]ny alien who at
any time after admission is convicted of two or more crimes involving moral turpitude, not

26    arising out of a single scheme of criminal misconduct . . . is deportable."

27    [2] INA § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), provides that "[a]ny alien who is
convicted of an aggravated felony at any time after admission is deportable."

28

1   detention is entitled to great deference and *"the Immigration Judge must have very substantial*

2   *grounds to override [the government's] decision to charge the alien with a ground that*

3   *subjects the alien to [mandatory] detention."* 22 I & N Dec. at 800 (emphasis added).  "Thus,"

4   according to the BIA, a lawful permanent resident can avoid mandatory detention *"only* when an

5   Immigration Judge is convinced that [the government] is *substantially unlikely to establish* . . .

6   the charge or charges that subject the alien to mandatory detention." *Id.* (emphasis added).  If the

7   alien carries that onerous burden, he does not win freedom from detention - merely a chance to

8   prove that he is worthy of release on bail because he poses no risk of fleeing his removal

9   proceedings or of endangering the community.[3]  That opportunity for an individualized bond

10  hearing is all that Mr. Guido seeks here, but the government's unlawful practices have placed

11  even that modest goal beyond reach.

12      By presuming that Mr. Guido "is deportable" on grounds that trigger mandatory detention

13  unless and until *he demonstrates* that the government is "substantially unlikely" to establish that

14  he is so deportable, the *Joseph* procedures violate the plain language of § 1226(c).  Because "8

15  U.S.C. § 1226(c) tells the Attorney General to 'take into custody any alien who . . . *is*

16  deportable,' not one who may nor may not fall into that category," "[o]nly those immigrants who

17  could not raise a 'substantial' argument against removability [on grounds that would trigger §

18  1226(c)(1)] should be subject to mandatory detention." *Tijani*, 430 F.3d at 1247 (Tashima, J.,

19  concurring)(emphasis in original).

20      The *Joseph* standard also raises serious due-process concerns under a line of Supreme

21  Court precedents requiring a standard of proof that favors the individual over the government in

22  civil proceedings that threaten important liberty interests.  *See, e.g., Woodby v. I.N.S.*, 385 U.S.

---

24      [3] *See Joseph*, 22 I & N Dec. at 809 (A determination that an alien "is not properly
25  included in a mandatory detention category . . . simply means that the lawful permanent resident
    could be considered by the Immigration Judge for release under the general bond provisions of
26  section 236(a) of the Act," 8 U.S.C. § 1226(a)); *In re Guerra*, 24 I & N Dec. 37, 38 (BIA
    2006)(In a custody re-determination hearing under INA § 236(a), 8 U.S.C. § 1226(a), the
27  immigration judge must consider whether the alien presents a danger to persons or property, is a
    danger to national security, or poses a risk of flight.)

28

276 (1966) (concerning removal proceedings); *Santosky v. Kramer*, 455 U.S. 745, 755 (1982)

(concerning proceedings to terminate parental rights). Instead of favoring the individual, the

*Joseph* standard heavily favors the government, and in so doing, makes mandatory detention

applicable even to lawful permanent residents like Mr. Guido who raise substantial arguments

against charges of removability that would trigger mandatory detention.[4] To avoid these serious

---

[4] In *Demore v. Kim*, 538 U.S. 510, 513-14, 523 (2003), the U.S. Supreme Court upheld the constitutionality of § 1226(c) as applied to an alien who **conceded** that he was deportable on grounds that subjected him to mandatory detention. The *Demore* Court did not address the constitutional adequacy of the *Joseph* procedures as a device for screening out aliens not subject to mandatory detention under § 1226(c) and, instead, repeatedly emphasized that Kim had "conceded that he was deportable because of a conviction that triggers § 1226(c) and thus [had] sought no *Joseph* hearing[.]" *Id.* at 514 n.3. *See also id.* at 522 (Kim did not "argue that he himself was not 'deportable' within the meaning of § 1226(c)."). "In conceding that he was deportable, [Kim] forwent a hearing at which he would have been entitled to raise any substantial argument available to demonstrate that he was not properly included in a mandatory detention category." *Id.* at 514. Thus, Kim "by his own choice did not receive one of the procedural protections otherwise provided to aliens detained under § 1226(c)." *Id.* at 523 n.6. Accordingly, the *Demore* Court had "no occasion to review the adequacy of *Joseph* hearings generally in screening out those who are improperly detained pursuant to § 1226(c)." *Id.* at 514 n.3.

Similarly, the Ninth Circuit has not determined the adequacy of the *Joseph* procedures. In *Tijani v. Willis*, 430 F.3d 1241, 1242 (9th Cir. 2005), the Court avoided the constitutional issues implicated by the *Joseph* procedures by interpreting § 1226(c) as applying only to cases involving the "expedited removal of criminal aliens" who had "conceded deportability." Because the petitioner in that case contested DHS's charge of deportability and had been detained for 32 months, the Court ruled that his removal proceedings had not been "expeditious" and that "the authority conferred by § 1226(c)," therefore, could no longer justify his detention. *Id.* In a concurring opinion, Judge Tashima addressed the issue that the majority opinion avoided, i.e., the constitutionality of the *Joseph* procedures. After noting "that individual liberty is one of the most fundamental rights protected by the Constitution," Judge Tashima found that the *Joseph* decision "gives that right little or no weight." *Tijani*, 430 F.3d at 1244 (Tashima, J., concurring). "Instead, [the *Joseph* decision] establishes a system of 'detention by default' by placing the burden fully on the alien to prove that he should not be detained." *Id.* "When such a fundamental right is at stake," Judge Tashima noted, the Supreme Court has insisted on heightened procedural protections to guard against the erroneous deprivation of that right." *Id.* "In particular, the Supreme Court has time and again rejected laws that place on the individual the burden of protecting his or her fundamental rights." *Id.* "In light of [these precedents]," Judge Tashima opined, "the *Joseph* standard is not just unconstitutional, it is egregiously so" because it "not only places the burden on the [alien] to prove that he should not be physically detained, it makes that burden all but insurmountable." 430 F.3d at 1246 (Tashima, J.,

1  due-process concerns and to give effect to the plain language of § 1226(c), which applies only in

2  the case of an alien who "*is* deportable" on grounds that trigger mandatory detention,  the Court

3  must interpret § 1226(c) as excluding lawful permanent residents who have substantial

4  arguments that they are not, in fact, deportable because of a conviction that triggers mandatory

5  detention.[5]

6      Moreover, the federal courts have consistently found that "the plain meaning" of §

7  1226(c)'s directive that the Attorney General take custody of certain aliens "when the alien is

8  released" applies only in those cases in which the alien was detained "immediately after release

9  from incarceration" and does not apply "to aliens released many years earlier." *Pastor-*

10  *Camarena v. Smith*, 977 F. Supp. 1415 (W.D. Wash. 1997).  In *Rivera v. Demore*, No. C99-

11  3042-THE, 1999 WL 521177, at *4 (N.D. Cal. July 13, 1999), for example, this Court noted that

12  § 1226(c) gives the Immigration and Naturalization Service ("INS") a strong incentive to detain

13  criminal aliens *immediately* after their release from criminal custody: if taken into INS custody

14  *immediately*, the mandatory detention rules apply, precluding the risk of flight arising from

15  release on bond and avoiding altogether the administrative burden and expense of bond

16

17

18

19  concurring).  *See also* Bhargava, Shalina, "Detaining Due Process: The Need for Procedural

20  Reform in "*Joseph*" Hearings After *Demore v. Kim*," 31 N.Y.U. Rev. L. & S. Change 51 (2006).

21      [5] Under long-established principles of due process,  the standard of proof employed in a
    government-initiated civil proceeding that threatens important liberty interests must be one that

22  favors the individual over the government, thereby "reflect[ing] the value society places on
    individual liberty." *Santosky*, 455 U.S. at 756 (internal citations omitted).  But the *Joseph*

23  standard used in Mr. Guido's case does the exact opposite: it loads the scales overwhelmingly in

24  the government's favor and results in the erroneous detention of lawful permanent residents who
    - despite raising substantial arguments against removal - cannot meet *Joseph*'s onerous

25  "substantially unlikely to prevail" standard. In such cases, the costs imposed by the *Joseph*

26  standard are especially high, since those wrongfully detained are the aliens most likely to win
    release on bond and least likely to abscond or to take other actions that might jeopardize their

27  success in the removal proceedings.  For the same reasons, the government's interest in detaining

28  those aliens is correspondingly weak.

1    hearings."[6] (Emphasis added). Because the petitioner in *Rivera* "was released from state

2    criminal incarceration . . . over three years before he was taken into custody by the INS,"

3    however, the Court concluded that "the prohibitions on release of aliens taken into custody under

4    section [1226(c)(1)] do not apply to him." *Id. See also Alikhani v. Fasano*, 70 F. Supp 2d 1124

5    (S.D. Cal. 1999) ("[T]he mandatory detention of aliens 'when' they are released requires that

6    they be detained at the time of release."); *Velasquez v. Reno*, 37 F. Supp. 2d 663, 672 (D. N.J.

7    1999) ("This court cannot simply ignore the plain language of the statute which provides that an

8    alien is to be taken into custody 'when' the alien is released"). Like the petitioner in *Rivera*, Mr.

9    Guido was "released" from criminal custody years before the Department of Homeland Security

10    ("DHS") commenced removal proceedings and detained him. Accordingly, the Court should

11    find that Mr. Guido is not subject to mandatory detention.

12                                **JURISDICTION**

13       This Court has habeas corpus jurisdiction under 28 U.S.C. § 2241 to review the

14    lawfulness of Mr. Guido's physical custody by DHS. *See INS v. St. Cyr*, 533 U.S. 289 (2001);

15    *Demore v. Kim*, 538 U.S. 510 (2003).

16                                    **VENUE**

17       Venue lies in the Northern District of California, where Mr. Guido is physically

18    detained, where his immigration proceedings are pending, where his custodians reside and carry

19    out their responsibilities, and where the witnesses pertinent to this habeas action are most likely

20    to be found. *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484, 493-94 (1973)

21    (noting that venue considerations in a habeas proceeding include "where the material events took

22    place; where records and witnesses pertinent to the petitioner's claim are likely to be found; [and]

23    the convenience of the parties").

24

25

26       [6] Pursuant to the *Department of Homeland Security Reorganization Plan, Homeland

27    *Security Act of 2002*, Pub. L. No. 107-296, 116 Stat. 2135 (2002), 6 U.S.C. §§ 101-557, as of
      March 1, 2003, the INS was abolished and its functions were transferred to the Department of

28    Homeland Security ("DHS").

1

### INTRADISTRICT ASSIGNMENT

2    Because a substantial portion of the events that gave rise to this lawsuit occurred in

3 the County of San Francisco, this case should be assigned to the Court's San Francisco division.

4 N.D. Rule 3-2(c) and (e).

5

### PETITIONER

6    Mr. Guido is lawful permanent resident of the United States who has been in DHS custody

7 since March 2007. He is currently being detained in the Santa Clara County Main Jail.

8

### RESPONDENTS

9    Lt. David Sepulveda is the Jail Administrator for the Santa Clara Department of

10 Correction, which encompasses the Santa Clara County Main Jail Complex in San Jose,

11 California, where Mr. Guido is presently confined. As the individual with daily physical control

12 over Mr. Guido, Lt. Sepulveda is a proper respondent to this petition and is sued in his official

13 capacity as Mr. Guido's immediate custodian. *See Vasquez v. Reno*, 233 F.3d 688, 696 (1st Cir.

14 2000), *cert. denied*, 122 S.Ct. 43 (2001); *Yi v. Maugans*, 24 F.3d 500, 507 (3d Cir. 1994);

15 *Robledo-Gonzalez v. Ashcroft*, 342 F.3d 667, 673 (7th Cir. 2003).

16    Edward Flores is the Chief of Correction for the Santa Clara Department of

17 Correction, which encompasses the Santa Clara County Main Jail Complex in San Jose,

18 California, where Mr. Guido is presently confined. As the individual with daily physical control

19 over Mr. Guido, Mr. Flores is a proper respondent to this petition and is sued in his official

20 capacity as Mr. Guido's immediate custodian. *See Vasquez, supra*; *Yi, supra*; *Robledo-Gonzalez,*

21 *supra.*

22    Anthony M. Aiello is the Assistant Field Office Director for the Immigration and Customs

23 Enforcement's ("ICE") Detention & Removal Operations' unit of the San Francisco District

24 Office, which has jurisdiction over the Santa Clara County Main Jail in San Jose, California. Mr.

25 Aiello has the power to release Mr. Guido and is, therefore, sued in his official capacity. *See*

26 *Vasquez, supra. See also Roman v. Ashcroft,* 340 F.3d 314, 320 (6th Cir. 2003) ("[A]lthough the

27 warden of each detention facility technically has day-to-day control over alien detainees, the INS

28

1  District Director for the district where a detention facility is located 'has power over' alien

2  habeas petitioners."); *Santiago v. U.S. I.N.S*, 134 F. Supp. 2d 1102, 1103 (N.D. Cal 2001).

3      Julie Myers is the Assistant Secretary of DHS's ICE division.  ICE is the component

4  within DHS that is responsible for the detention and removal of non-citizens.  Ms. Myers leads

5  the detention and removal functions of ICE and is sued in her official capacity.

6      Respondent Michael Chertoff is sued in his official capacity as the Secretary of DHS.

7  In that capacity, he has responsibility for the administration and enforcement of the immigration

8  laws pursuant to 8 U.S.C. § 1103, as amended.

9      Respondent Alberto Gonzales is sued in his official capacity as Attorney General of

10  the United States.  He retains certain responsibilities for administration and enforcement of the

11  immigration laws pursuant to 8 U.S.C. § 1103.  Respondent Gonzales is sued in his official

12  capacity to the extent that 8 U.S.C. § 1103 gives him the authority to detain Mr. Guido and to

13  interpret the law as it is applied by DHS and the U.S. Department of Justice.

## STATEMENT OF THE CASE

15      Mr. Guido is a native and citizen of Mexico who has lived in the United States as a lawful

16  permanent resident since August 12, 1987.  Exh. 1 (*Notice to Appear*); 2 (*IJ's Amended*

17  *Memorandum and Order, April 20, 1997*) at 1.  He is the father of six United States citizen

18  children, ranging in age from 22 to two years.  Exh. 7 (*Petition for Alien Relative*).

19      On March 27, 1992, Mr. Guido pled guilty to a felony violation of Cal. Penal Code §

20  288(a).[7]  Exh 4 (*Criminal Docket Sheet*) at 4.  Shortly thereafter, he was sentenced to nine

21  months in the Sonoma County Jail, three years of formal probation, counseling, and community

22  service. *Id.* at 5.  In addition, he was ordered to register as a sex offender pursuant to Cal. Penal

23  Code § 290. *Id.*  Mr. Guido successfully finished his probation on April 30, 1995. *Id.* at 6.

---

25      [7] The Criminal Information alleges that Mr. Guido "did wilfully and unlawfully and

26  lewdly commit a lewd and lascivious act, to wit, touch the chest of certain parts and members
thereof of ANNA ISOL, a child under the age of fourteen years, with the intent of arousing,

27  appealing to, and gratifying the lust, passions, sexual desires of [Mr. Guido] and the said child."
Exh. 5 (*Information*).

28

1    Eleven years later, on August 21, 2003, Mr. Guido was convicted of a misdemeanor

2  violation of Cal. Penal Code § 290(a)(1)(D) for failing to comply with the State of California's

3  sexual offender registration requirements. Exh __ (*Criminal Docket Sheet*) at 2. After

4  suspending the imposition of sentence, the Court placed Mr. Guido on 24 months probation and

5  fined him $100 pursuant to Cal. Penal Code § 1202.4(b). *Id.* Mr. Guido was never incarcerated

6  for his conviction and completed his probationary sentence on August 21, 2005. *Id.* at 3.

7    In March 2007 -- four years after his misdemeanor conviction under Cal. Penal Code §

8  290(a)(1)(D) and 15 years after his conviction under Cal. Penal Code § 288(a) -- DHS officers

9  visited Mr. Guido's home. When Mr. Guido learned of this visit, he turned himself in and has

10  been in DHS custody since that time. *Id.* On March 19, 2007, DHS commenced removal

11  proceedings against Mr. Guido with the issuance of a Notice to Appear, which alleges that Mr.

12  Guido was convicted of a violation of Cal. Penal Code § 288(a) and that he is, therefore, subject

13  to removal under INA 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(iii), as an alien who, at any time

14  after admission, has been convicted of an aggravated felony. Exh.1 (*Notice to Appear*). That

15  same day, DHS informed Mr. Guido "that pending a final determination by the immigration

16  judge in your case, and in the event that you are ordered removed from the United States, until

17  you are taken into custody for removal, you shall be . . . detained in the custody of this Service"

18  without bond. *Id.*

19    Section § 1226(c)'s mandatory detention provisions apply only to aliens released after

20  October 8, 1998. *In re West*, 22 I & N Dec. 1405, 1406 (BIA 2000). So, to justify Mr. Guido's

21  detention, the government argued that because Mr. Guido had been arrested and charged under

22  Cal. Penal Code § 290(a)(1)(D) after October 8, 1998, he is subject to mandatory detention (even

23  though he was ultimately sentenced to probation and was never incarcerated for his crime). In

24  addition, the government argued that Mr. Guido's conviction under Cal. Penal Code §

25  290(a)(1)(D) is a crime involving moral turpitude ("CIMT"), which renders Mr. Guido

26  deportable under INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii), and that Mr. Guido is,

27  therefore, subject to mandatory detention under 8 U.S.C. § 1226(c)(1)(B), as an alien who "is

28

1  deportable" for two CIMTs.[8]

2      On April 20, 2007, the Immigration Judge ("IJ") issued a Memorandum and Order, in which

3  he concluded that Mr. Guido "is subject to mandatory detention" under 8 U.S.C. § 1226(c).  As a

4  threshold matter, the IJ rejected DHS's "position that [Mr. Guido] has committed two crimes

5  involving moral turpitude."  Exh 2 (*IJ's Amended Memorandum and Order*).  Concluding that

6  Mr. Guido's failure to register under Cal. Penal Code § 290 was not a CIMT, the IJ noted:

7      In *People v. Barker*, 34 Cal. 4th 345, 18 Cal. Rptr. 3d 260 (2004), the California Supreme
       Court held that a defendant cannot assert as a defense to a section 290 charge that he forgot
8      to register.  In substance, the court held that some things are so important that the failure to
       take steps to ensure that they are done is itself a crime.  By eliminating the defense of
9      forgetfulness, the court held that forgetting to register is a "willful" violation of section 290.

10                                        * * *

11     While it is reprehensible for a sex offender to fail to take steps to ensure that he registers as
       required by law, forgetting to take those steps does not necessarily require evil intent, a
12     corrupt mind, or a willingness to commit acts of baseness or depravity.  Thus, the full range
       of conduct prohibited by the statute is broader than conduct that would be turpitudinous.

13
    Exh. 2 (*IJ's Amended Memorandum and Order, April 20, 2007*) at 2.

14
       Notwithstanding his conclusion that Mr. Guido's conviction under Cal. Penal Code § 290

15  was not a CIMT, the IJ found  Mr. Guido subject to mandatory detention, stating "it is immaterial

16  whether" Mr. Guido's post-October 8, 1998 resulted in a conviction or even "relates to a

17  removable offense."  Exh 2 (*IJ's Amended Memorandum and Order*) at 2.  "The dispositive

18  question," the IJ said, is "simply whether [Mr. Guido] was in the physical custody of the state on

19  criminal charges after" October 8, 1998.  *Id.*  "Because [Mr. Guido] has been convicted of a

20  crime specified in [§ 1226(c)(1)(B), i.e. the 1992 conviction under Cal. Penal Code § 288(a)],

21

22      [8] The government does not appear to have formally charged Mr. Guido with deportability
    under INA § 237(a)(2)(A)(ii), 8 U.S.C. § 1227(a)(2)(A)(ii).  In a recent case, however, the BIA
23  ruled "that the 'is deportable' language in the current mandatory custody statute does not require
    that the alien be charged with or found deportable on the particular ground on which detention is
24  based."  *In re Kotliar*, 24 I & N Dec. 124, 126 (BIA 2007).  Rather, "[w]here the record reflects
    that an alien has committed any of the offenses" enumerated in the mandatory detention statute,
25  "the alien is subject to mandatory detention pursuant to section 236(c)(1)(B) [8 U.S.C. §
    1226(c)(1)(B)] as one who 'is deportable' for the offense, without regard to whether the
26  Department of Homeland Security ("DHS") has exercised its prosecutorial discretion to lodge a
    charge based on the offense."  *Id.*

27

28

1   and he was lawfully arrested and released from criminal custody after [October 8, 1998]," the IJ

2   said, "he is subject to mandatory detention." *Id.* at 2-3.

3       Although Mr. Guido appealed the IJ's order, the BIA dismissed that appeal on May 22,

4   2007. Exh 3 (*BIA Decision*). In sustaining the IJ's conclusion that Mr. Guido is subject to

5   mandatory detention under § 1226(c), the BIA made three points. First, focusing on Mr. Guido's

6   March 27, *1992*, felony conviction under Cal. Penal Code § 288(a), the BIA said:

> We are not convinced that it is substantially unlikely that the Department of Homeland
> Security will establish that [Mr. Guido] was convicted of an aggravated felony, as defined in
> section 101(a)(43)(A) of the Act [8 U.S.C. § 1101(a)(43)(A)] (sexual abuse of a minor).  *See*
> 8 C.F.R. § 1003.19(h)(2)(ii); *Matter of Joseph*, 22 I & N Dec. 799, 802 (BIA 1999). The
> record reflects that [Mr. Guido] was convicted for the offense of Lewd and Lascivious Acts
> with a child under 14 years of age in violation of California Penal code section 288(a) in
> 1992. *See United States v. Baroon-Medina*, 187 F.3d 1144, 1146 (9th Cir. 1999)(holding
> that a violation of California Penal Code section 288(a) is an aggravated felony).

11  Exh 3 (*BIA Decision*). Although Mr. Guido was released from custody on his 1992 felony

12  conviction nearly five years before § 1226(c) came into effect, the BIA did not see that as a

13  problem, stating:

> [T]he record reflects that [Mr. Guido] was released from custody following [October 9,
> 1998, the effective date of [§ 1226(c)], inasmuch as [he] was taken into custody by DHS
> after having been released from state custody for a 2003 offense for Failure to Register as a
> Sex Offender under California Penal Code section 290. *See Matter of West*, 22 I & N Dec.
> 1405 (BIA 2000). While [Mr. Guido] argues that his 2003 offense does not render him
> removable, we note that *the relevant inquiry with regard to his 2003 offense is the date of
> release from physical custody and not whether his 2004 [sic] offense resulted in a
> conviction that would support a removability charge.*

19  *Id.*[9] (emphasis added). Finally, the Board noted that, despite substantial arguments to the

20  contrary, a divided panel of the Board had recently held "that willful failure to register by a sex

21  offender who has been previously apprised of the obligation to register, in violation of section

22  290(g)(1) of the California Penal Code, is a crime involving moral turpitude." *Id.*

---

26       [9] The BIA did not grapple with the fact that the Superior Court of California had

27  suspended the imposition of sentence and placed Mr. Guido on 24 months probation for his

28  misdemeanor conviction for failing to maintain his registration as a sex offender.

# ARGUMENT

I. **THE PLAIN LANGUAGE OF § 1226(c)(1) LIMITS MANDATORY DETENTION TO ALIENS WHO, AFTER OCTOBER 8, 1998, ARE "RELEASED" FROM CUSTODY FOR AN "OFFENSE" WHICH RENDERS THE ALIEN INADMISSIBLE OR DEPORTABLE, AND THE BIA ERRED IN FINDING TO THE CONTRARY.**

Section 1226(c)'s mandatory detention provisions apply only to aliens "released" after October 8, 1998.[10]  *See In re Adeniji*, 22 I & N Dec. 1102 (BIA 1999); *In re West*, 22 I & N Dec. 1405 (BIA 1999); *Grant v. Zemski*, 54 F. Supp. 2d 437, 439-41 (D.D. Pa. 1999); *Saucedo-Tellez v. Perryman*, 55 F. Supp. 2d 882 (N.D. Ill 1999); *Aguilar v. Lewis*, 50 F. Supp. 2d 539, 544 (E.D. Va. 1999).  Just what kind of post-October 8, 1998 "release" will trigger mandatory detention, however, is a matter of dispute.  In Mr. Guido's view, the language, structure, history and past interpretations of § 1226(c) lead to the inescapable conclusion that to be subject to mandatory detention, an alien must be released, after October 8, 1998, from incarceration for an "offense" that renders him "inadmissible" or "deportable."  By contrast, the BIA maintains that any post-October 8, 1998 detention and release -- even one prompted by a simple traffic violation -- can trigger mandatory detention if, as in this case, the alien was released from custody *before* October 9, 1998 for a conviction that renders him deportable.  In this case, for example, the BIA held that Mr. Guido's 2003 arrest triggers mandatory detention, irrespective of whether the arrest was for a deportable offense and irrespective of whether Mr. Guido was sentenced to a period of incarceration for the offense.  Exh. 3 (*BIA Decision*).  In doing so, the BIA erred.

"The mandatory detention aspects of [§ 1226(c)] . . . derive from" paragraph (2), which "specifies that the Attorney General may release '*an alien described in paragraph (1)*' only if certain strict conditions are met."  *In re Rojas*, 23 I & N Dec. 117, 119 (BIA 2001).  Mr. Guido is subject to mandatory detention, therefore, only if he is "an alien described in paragraph (1)" of § 1226(c), which provides:

---

[10]  Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") § 303(b)(2) expressly provides that the provisions of § 1226(c) "shall apply to individuals released after" October 8, 1998, the date on which the Transition Period Custody Rules expired.

The Attorney General shall take into custody any alien who-

(A)   is inadmissible by reason of having committed *any offense* covered in section 1182(a)(2),

(B)   is deportable by reason of having committed *any offense* covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (d),

(C)   is deportable under section 1227(a)(2)(A)(i) on the basis of *an offense* for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

(D)   is inadmissible under section 1182(a)(3)(B) or deportable under section 1227(a)(4)(B),

*when the alien is released*, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the *same offense*.

(Emphasis added).

"[T]he meaning of statutory language, plain or not, depends on context," and it is, therefore, a "cardinal rule" that "a statute is to be read as a whole." *King v. St. Vincent's Hospital*, 502 U.S. 215, 221 (1991). "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used . . . " *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941)(L. Hand, J.)(*quoted in Shell Oil Co. v. Iowa Dept. of Revenue*, 488 U.S. 19, 25 n.6 (1988)). When viewed in context, the meaning of "when the alien is released" ("the 'when . . . released' clause") is clear. Because it immediately follows the directive that the Attorney General "shall take into custody any alien who is "inadmissible" or "deportable" "by reason of having committed" a criminal or terrorist "*offense*," the "when . . . released" clause most naturally means "when the alien is released" for such an "offense." This natural reading is bolstered by the last clause of § 1226(c)(1) which makes clear that the "when . . . released" clause applies irrespective of "whether the alien may be arrested or imprisoned for the *same offense*." Because the "when . . . released" clause is immediately preceded by a list of "offense[s]" that justify mandatory detention and followed by an admonishment that mandatory detention is appropriate even if "the alien may be arrested or imprisoned again for the *same offense*," the most sensible and plain reading of the "when . . . released" clause is that it applies only to aliens who are being released, after October 18, 1998, for an offense that renders them

1    inadmissible or deportable.  *See Commissioner v. Lundy*, 516 U.S. 235, 250 (1996)("The

2    interrelationship and close proximity of these provisions of the statute 'presents a classic case for

3    application of the 'normal rule of statutory construction that identical words used in different

4    parts of the same act are intended to have the same meaning.'") (*quoting Sullivan v. Stroop*, 496

5    U.S. 478, 484 (1990)).

6         The IJ and BIA erroneously came to the opposite conclusion.  Noting that "[u]nder the

7    Double Jeopardy Clause . . . a person cannot be lawfully arrested and imprisoned a second time

8    for an offense after a conviction for the same offense," the IJ concluded that the last clause in §

9    1226(c)(1) – "without regard to whether the alien may be arrested or imprisoned again for the

10   same offense" – "contemplates [mandatory] detention for a person who has committed an

11   enumerated offense in the past and who, after [October 8, 1998], has been arrested, not

12   convicted, and released."  Exh 2 (*IJ's Amended Memorandum and Order*) at 2.  The BIA seems

13   to agree.  *See In re West*, 22 I & N Dec. 1405, 1410 (BIA 2000).  For three reasons, however, this

14   makes no sense.  First, notwithstanding the IJ's suggestion to the contrary, an alien "released on

15   parole, supervised release, or probation" most certainly can be "arrested and imprisoned again for

16   the same offense" if he violates the terms of his "parole, supervised release, or probation."

17   Second, the phrase "imprisoned again" makes clear that this was precisely the situation that the

18   clause was designed to address.  The plain meaning of "imprison" is "[t]o confine a person in a

19   prison," i.e. "[a] state or federal facility of confinement for *convicted* criminals, esp. felons."

20   *Black's Law Dictionary* (8th ed. 2004) at 773, 1232 (emphasis added).  Thus, the phrase

21   "imprisoned again for the same offense" unambiguously indicates that an alien who has already

22   been convicted and imprisoned for a removable offense is subject to mandatory detention even if

23   there is a possibility that he will be rearrested and "***imprisoned* again** for the same offense," e.g.,

24   for a violation of parole.  Third, the language of § 1226(c) is undoubtedly based on that of former

25   INA § 242(a)(2), 8 U.S.C. § 1252(a)(2), as amended by section 504 of the Immigration Act of

26   1990, Pub. L. No. 101-649, 104 Stat. 4978, 5049 ("1990 Act"), and by section 306(a)(4) of the

27   Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No.

28   Petition for Writ of Habeas Corpus                          -13-

102-232, 105 Stat. 1733, 1751 (effective as if included in the 1990 Act), which provided:

> (A) The Attorney General shall take into custody any alien convicted of an aggravated felony *upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense)*. Notwithstanding paragraph (1) or subsections (c) and (d) but subject to subparagraph (B), the Attorney General shall not release such felon from custody.
>
> (B) The Attorney General may not release from custody any lawfully admitted alien who has been convicted of an aggravated felony, either before or after a determination of deportability, unless the alien demonstrates to the satisfaction of the Attorney General that such alien is not a threat to the community and that the alien is likely to appear before any scheduled hearings.

(Emphasis added). Although the current version of the mandatory detention statute applies to expanded class of aliens - i.e, aliens who are inadmissible or deportable for offenses other than aggravated felonies – it retains , in a nearly identical form, former § 1252(a)(2)'s command that the Attorney General shall take such an alien into custody "*upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense)*." (Emphasis added).  Like the current statute, this language makes clear  that an alien who has been convicted of a removable offense and then "released on parole, supervised release, or probation" may be subject to mandatory detention notwithstanding "the possibility of rearrest or further confinement in respect of the same offense.[11]

In sum, nothing in § 1226(c)(1) "contemplates [mandatory] detention for a person who has committed an enumerated offense in the past and who, after [October 8, 1998], has been arrested, not convicted, and released." Exh 2 (*IJ's Amended Memorandum and Order*) at 2.  Rather, the provision plainly applies only to an alien who "is deportable" or "inadmissible" for an offense for which he was released from incarceration after October 8, 1998.

In "guidelines" that it issued less than one year after § 1226(c) took effect, the former INS

---

[11] Similarly, the original version of the mandatory detention statute provided: "The Attorney General shall take into custody any alien convicted of an aggravated felony *upon completion of the alien's sentence for such conviction*.  Notwithstanding subsection (a), the Attorney General shall not release such felon from custody." *See* INA § 242(a)(2), 8 U.S.C. § 1252(a)(2)(Supp. I 1989)(Emphasis added).

largely agreed.  On July 12, 1999, Michael A. Pearson, Executive Associate Commissioner for

Filed Operations informed the INS Regional Directors that thereafter, "[a]ny alien, regardless of

status, who . . . completed a criminal sentence, on or after 10/9/98, *based on a conviction which*

*constitutes a removable offense*, regardless of the date of conviction . . . [is] subject to

mandatory detention under [8 U.S.C. § 1226(c)].  Exh 8 (*Pearson Memo*)(emphasis added).  In

explaining its interpretation, INS offered the following example:

> Q:    An alien comes to INS's attention as a referral from a local police officer who
> stopped the alien on a traffic violation and discovered numerous outstanding traffic
> warrants.  The alien has a 1975 conviction for assault with a weapon for which he
> was sentenced to 2 years, served 6 months, and completed the remaining time on
> parole.  He has no other criminal convictions but for the traffic violations he is
> currently being arrested for.  The alien is turned over to INS custody from the local
> police officer.  Is the alien eligible for a custody determination hearing or is he
> subject to mandatory detention?
>
> A:    The alien is eligible for a custody determination.  Although his removable conviction
> for an aggravated felony falls within [§ 1226(c)], his sentence was completed prior to
> 10/9/98.

*Id.* at 4.

Similarly, although Mr. Guido was convicted of a felony violation of Cal. Penal Code §

288(a), he completed his sentence and was released from custody for that crime long before

October 9, 1998 and is subject to mandatory detention, therefore, only if he *also* has been

released from custody after October 8, 1998 for an offense that *renders him inadmissible or*

*deportable*.  In ruling to the contrary, the BIA erred.[12]

_____

[12]  Moreover, the plain language of  § 1226(c) permits the mandatory detention of only
those aliens who have been "released" from criminal incarceration for a deportable offense,
"without regard to whether the alien is released on parole, supervised release, or probation."  8
U.S.C. § 1226(c)(1).  After all, even the Board recognizes that: (1) "'Parole' means the
conditional release of a prisoner who has served part of the term *for which he was sentenced to
prison*;" (2) "'Probation' means a sentence 'whereby a *convicted* criminal offender is released
into the community under the supervision of a probation officer in lieu of incarceration;" and (3)
"'Supervised release' under federal criminal law is a period of supervision *following completion
of a prison term*."  *In re West*, 22 I & N Dec. 1405, 1408-09 (BIA 2000), *citing Black's Law
Dictionary* at 1116, 1202  (6th ed. 1990) (emphasis added).  Although Mr. Guido was arrested
and charged with a misdemeanor violation of Cal. Penal Code § 290(a)(1)(D), he was not
sentenced to any jail time for that offense.  Because Mr. Guido was sentenced to probation and
"was never in physical custody" for his conviction under Cal. Penal Code § 290(a)(1)(D), he

**II. IN DETERMINING WHETHER MR. GUIDO "IS DEPORTABLE" BECAUSE OF HIS AUGUST 2003 MISDEMEANOR CONVICTION UNDER CAL. PENAL CODE § 290(a)(1)(D), THE BOARD APPLIED AN INCORRECT LEGAL STANDARD AND VIOLATED MR. GUIDO'S FIFTH AMENDMENT RIGHT TO DUE PROCESS.**

In passing, the BIA suggested that even if § 1226(c) applies only to an alien released, after October 8, 19998, for an offense that renders him inadmissible or deportable, Mr. Guido is subject to mandatory detention because he "is deportable" for his misdemeanor conviction under Cal. Penal Code § 290(a)(1)(D), as an alien who has been convicted of two CIMTs. Exh 3 (*BIA Decision*). By way of explanation, the BIA simply "note[d] that the Board recently held in *Matter of Tobar-Lobo*, 24 I & N Dec. 143 (BIA 2007), that willful failure to register by a sex offender who has been previously apprised of the obligation to register, in violation of section 290(g)(1) of the California Penal Code, is a crime involving moral turpitude." *Id.* In finding that Mr. Guido "is deportable" (as an alien convicted of two CIMTs) for purposes of § 1226(c), however, the Board applied an incorrect legal standard.

A. **The *Joseph* Standard – Which Allows a Lawful Permanent Resident to Avoid Mandatory Detention "Only" If He Can Convince the IJ That the Government Is Substantially Unlikely to Establish the Charge or Charges That Subject the Alien to Mandatory Detention – Is Blatantly Unconstitutional.**

Section § 1226(c) plainly applies only to an alien who "is deportable" for an offense, for which he was released from incarceration after October 8, 1998. Unfortunately, however, § 1226(c) does not define the phrase "is deportable." *Tijani*, 430 F.3d at 1243 (Tashima, J., concurring). "The implementing regulations also do little to help; they provide an alien with the opportunity to establish that he is 'not properly included' in the statute's reach, but they say nothing about what, precisely, the alien must show." *Id.*, citing 8 C.F.R. § 1003.19(h)(ii) (2005). In the *Joseph* case, the BIA attempted to fill the statutory and regulatory gap, ruling that the government's allegation that an alien "is deportable" for reasons that would justify mandatory detention is entitled to great deference and ***the Immigration Judge must have very substantial***

---

"could not have been 'released' . . . for purposes of triggering mandatory detention" under § 1226(c), and he is not, therefore, subject to mandatory detention. *Tenrreiro v. Ashcroft*, No. CV-04-768-PA, 2004 WL 1354277, at * 2 (D. Or. June 14, 2004), *vacated on other grounds*, 2004 WL 1588217 (D. Or. July 12, 2004).

1   *grounds to override [the government's] decision to charge the alien with a ground that*

2   *subjects the alien to [mandatory] detention."* 22 I & N Dec. at 800 (emphasis added).

3   According to the BIA, a lawful permanent resident can avoid mandatory detention *"only* when an

4   Immigration Judge is convinced that [the government] is *substantially unlikely to establish . . .*

5   the charge or charges that subject the alien to mandatory detention." *Id.* (emphasis added).

6       The *Joseph* standard, however, is exactly the opposite of what due process requires.  In civil

7   proceedings that threaten important liberty interests, due process requires a standard of proof that

8   is not only *less* favorable to the government than the *Joseph* standard, but one that is *explicitly*

9   *favorable to the individual.  See Chaunt v. United States*, 364 U.S. 350, 353 (1960)(government

10  can revoke a citizen's naturalization only if there is "clear, unequivocal, and convincing"

11  evidence that an individual obtained his citizenship illegally); *Woodby v. I.N.S.*, 385 U.S. 276

12  (1966)(lawful permanent resident can be deported only if deportability is established by clear,

13  unequivocal and convincing evidence).

14      "Procedural due process imposes constraints on governmental decisions which deprive

15  individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of

16  the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  "The

17  fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and

18  in a meaningful manner.'" *Id.* at 333.  Where an alien's due-process liberty interests are at stake,

19  courts employ the three-part *Mathews* test for determining what procedural protections are

20  constitutionally mandated.  *See Flores-Chavez v. Ashcroft*, 362 F.3d 1150, 1160-61 (9th Cir.

21  2004).  That test requires the Court to consider: (1) the private interests that will be affected by

22  the official action; (2) the risk of an erroneous deprivation of those interests through the

23  procedures used; and (3) the government's interest, including the function involved and the fiscal

24  and administrative burdens that the additional or substitute procedural requirement would entail.

25  *Id.* at 1161 (*citing Mathews*, 424 U.S. at 335).

26      In conducting the *Mathews* analysis, this Court must be mindful of the fact that when a

27  "fundamental right is at stake . . . the Supreme Court has insisted on heightened procedural

28  Petition for Writ of Habeas Corpus        -17-

1   protections to guard against the erroneous deprivation of that right. In particular, the Supreme

2   Court has time and again rejected laws that place on the individual the burden of protecting his or

3   her fundamental rights." *Tijani*, 430 F.3d at 1244 (Tashima, J., concurring). In his concurring

4   opinion in *Tijani*, Judge Tashima meticulously described this unbroken line of Supreme Court

5   precedent. 430 F.3d at 1244-1246 (Tashima, J., concurring).

6       In *Addington v. Texas,* 441 U.S. 418 (1979), for example, the Court vacated a Texas

7   Supreme Court ruling that a person could be civilly committed based upon a finding – by a mere

8   preponderance of the evidence – of mental illness. *Id.* at 432-33. In so concluding, the Court

9   described the "function of a standard of proof, as that concept is embodied in the Due Process

10  Clause." *Id.* at 423. The Court explained that "a standard of proof" serves to allocate the risk of

11  an erroneous decision among litigants based upon the competing rights and interests involved.

12  *Id.* In a civil case where no fundamental rights are implicated, the interests involved are minor

13  and "society has a minimal concern with the outcome;" consequently, the litigants share the risk

14  of error roughly equally under the preponderance of the evidence standard. *Id.* In a criminal

15  case, on the other hand, "the interests of the defendant are of such magnitude" that "our society

16  imposes almost the entire risk of error upon itself" by insisting on the beyond a reasonable doubt

17  standard. *Id.* at 423-24.[13]

18  _____

19      [13] Similarly, in *In re Winship*, 397 U.S. 358 (1970), the Supreme Court observed that
    "there is always in litigation a margin of error, representing error in factfinding, which both

20  parties must take into account. Where one party has at stake *an interest of transcending value* -
    as a criminal defendant his *liberty* - this margin of error is reduced as to him by the process of

21  placing on the other party the burden of persuading the factfinder at the conclusion of the trial of

22  his guilt beyond a reasonable doubt." *Id.* at 364 (emphases added) (quotation marks, ellipses, and

23  citation omitted).

24      In his much-quoted *Winship* concurrence, Justice Harlan explained that identifying the
    constitutionally required standard of proof in any given proceeding reflects a "fundamental

25  assessment of the comparative social costs of erroneous factual determinations." *Id.* at 369-70

26  (Harlan, J., concurring). Justice Harlan cited two principles in support of this contention. First,
    standards of proof "communicate to the finder of fact different notions concerning the degree of

27  confidence he is expected to have in the correctness of his factual conclusions." *Id.* at 370. And
    second, it is inevitable that the factfinder will err, sometimes in favor of the prosecuting party,

28

1    Employing these principles, the Court held that there must be "clear and convincing

2    evidence" of mental illness before an individual could be involuntarily committed and thus

3    deprived of his liberty. *Id.* at 432-33. Noting that it "repeatedly has recognized that civil

4    commitment for any purpose constitutes a significant deprivation of liberty that requires due

5    process protection," *id.* at 425, the Court found it improper to ask "[t]he individual ... to share

6    equally with society the risk of error when the possible injury to the individual is significantly

7    greater than any possible harm to the state," *id.* at 427. Thus, the Court concluded that "due

8    process requires the state to justify confinement by proof more substantial than a mere

9    preponderance of the evidence." *Id.* at 427.

10    As Judge Tashima noted in *Tijani*:

11         Since *Addington,* the Supreme Court has repeatedly reaffirmed the principle that
"due process places a heightened burden of proof on the State in civil proceedings in which

12    the 'individual interests at stake ... are both particularly important and more substantial than
mere loss of money.'" *Cooper v. Oklahoma,* 517 U.S. 348, 363 (1996) (quoting *Santosky v.*

13    *Kramer,* 455 U.S. 745, 756 (1982)) (internal quotation marks omitted). In *Santosky,* for
example, the Court considered a New York law that allowed the state to terminate parental

14    rights upon proof of "permanent neglect" by a preponderance of the evidence. 455 U.S. at
747. Because the statute directly affected the "fundamental liberty interest of natural parents

15

16    sometimes in favor of the defending party. By calibrating the "degree of confidence" that the

17    factfinder should have in his conclusions, the standard of proof "influences the relative frequency
of these two types of erroneous outcomes." *Id.* at 370-71. Therefore, the standard of proof

18    should reflect "an assessment of the comparative social disutility of each" type of error. *Id.* at
371. For example, the preponderance-of-the-evidence standard is "peculiarly appropriate" in a

19    civil damages suit between private parties because in such cases, society regards it as "no more

20    serious in general for there to be an erroneous verdict in the defendant's favor than for there to be
an erroneous verdict in the plaintiff's favor." *Id.* at 371.

21

22         Justice Harlan's reasoning figured prominently in later Supreme Court decisions holding
that due process requires an elevated proof standard when an individual's vital liberty or property

23    interests are threatened by government - initiated civil proceedings. In such cases, the social
disutility of erroneous findings against the individual far outweighs the social disutility of

24    erroneous findings against the government. These cases teach that, "in any given proceeding, the
minimum standard of proof tolerated by the due process requirement reflects not only the weight

25    of the private and public interests affected, but also a societal judgment about how the risk of

26    error should be distributed between the litigants." *Santosky v. Kramer,* 455 U.S. 745, 755
(1982). Thus, "[i]n cases involving individual rights, whether criminal or civil, the standard of

27    proof at a minimum reflects the value society places on individual liberty." *Id.* at 756

28    (quotations, brackets, and citation omitted).

in the care, custody, and management of their child," *id.* at 753, the Court held that it needed to include greater procedural protection than the preponderance of the evidence standard. *Id.* at 769-70.

Again, in *Foucha v. Louisiana,* 504 U.S. 71 (1992), the Court found a statute unconstitutional that placed on civilly committed individuals the burden of proving that they were not a danger to the public before allowing their release. *Id.* at 73, 83. Noting that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," the court held that such a system failed adequately to protect the individual's liberty interest. *Id.* at 83 (quoting *United States v. Salerno,* 481 U.S. 739, 755 (1987)). Once again, because "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause," clear and convincing evidence was needed to civilly commit the individual. *Id.* at 80.

Finally, in *Cooper,* the Court unanimously rejected a state-law presumption that a defendant was competent to stand trial unless that defendant established his incompetence by clear and convincing evidence. 517 U.S. at 350. Stating that "we perceive no sound basis for allocating to the criminal defendant the large share of the risk which accompanies a clear and convincing evidence standard," the Court held that the Oklahoma law violated due process. *Id.* at 366.

*Tijani,* 430 F.3d at 1245 (Tashima, J., concurring).

With these precedents in mind, the Court must apply the *Mathews* factors to the BIA's decision in *Joseph.*

### 1.    Affected Interest of the Individual.

The first prong of the *Mathews* analysis requires this Court to assess both the seriousness and the duration of the wrongful deprivation that might result from an erroneous determination in a *Joseph* hearing. "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss.'" *Santosky,* 455 U.S. at 758 (citation and quotation marks omitted). Whether that loss is grave enough to warrant a heightened proof standard will therefore turn on "the nature of the private interest threatened" and "the permanency of the threatened loss." *Id.* Even where not permanent, the "possible *length* of wrongful deprivation" is an "important factor in assessing the impact of a challenged administrative practice. *Mathews,* 424 U.S. at 341-342 (emphasis added) (citation and quotation marks omitted) (discussing erroneous termination of social-security benefits). Thus, the "torpidity" of the administrative review process may itself impose significant hardships that merit consideration under the first *Mathews* prong. *Id.*

As a lawful permanent resident, Mr. Guido enjoys the highest constitutional protection

1  afforded to any alien - a degree of protection approaching that of a full citizen. "The

2  constitutional protection of an alien's person and property is particularly strong in the case of

3  aliens lawfully admitted to permanent residence (LPRs)." *Demore*, 538 U.S. at 543-44 (Souter,

4  J., concurring in part and dissenting in part). "[O]nce an alien lawfully enters and resides in this

5  country he becomes invested with the rights guaranteed by the Constitution to all people within

6  our borders. Such rights include those protected by the First and the Fifth Amendments and by

7  the due process clause of the Fourteenth Amendment. None of these provisions acknowledges

8  any distinction between citizens and resident aliens. They extend their inalienable privileges to

9  all 'persons' and guard against any encroachment on those rights by federal or state authority."

10  *Id.* at 546 (citations and quotation marks omitted). Thus, the law considers an LPR to be "at

11  home in the United States," and even when the government seeks removal, the Supreme Court

12  has accorded LPRs "greater protections than other aliens under the Due Process Clause." *Id.* at

13  547. And a lawful permanent resident retains this status, with all of its attendant privileges and

14  protections, until it is terminated by a final order of removal. *See Demore*, 538 U.S. at 543

15  (Souter, J., concurring in part and dissenting in part) (*citing* 8 C.F.R. § 1.1(p)).

16      The Court must conclude, therefore, that Mr. Guido's interest in being free from bodily

17  restraint equals that of a United States citizen and is of the highest order. *See Foucha,* 504 U.S.

18  at 80 ("Freedom from bodily restraint has always been at the core of the liberty protected by the

19  Due Process Clause."); *United States v. Salerno*, 481 U.S. 739, 755 (1987)("In order society

20  liberty is the norm, and detention prior to trial or without trial is the carefully limited

21  exception.").

22      2.    Risk of Error and Probable Value of Additional Safeguards.

23      Under *Mathews* and its progeny, this Court "next must consider both the risk of erroneous

24  deprivation of private interests resulting from use of [the *Joseph*] standard and the likelihood that

25  a higher evidentiary standard would reduce that risk." *Santosky*, 455 U.S. at 761. Since a *Joseph*

26  hearing is an "adversary contest" between the detainee and the government, "the relevant

27  question is whether [the *Joseph*] standard fairly allocates the risk of an erroneous factfinding

28

1    between these two parties." *Id.*

2        In this respect, "the *Joseph* standard is not just unconstitutional, it is egregiously so." *Tijani*,

3    430 F.3d at 1246 (Tashima, J., concurring).  As noted above, the Supreme Court repeatedly has

4    held that individuals, including aliens, may not be deprived of physical liberty or other important

5    interests under any standard of proof less demanding than "clear and convincing evidence"; a

6    mere "preponderance of the evidence" standard will not do.  *See, e.g., Chaunt*, 364 U.S. 350;

7    *Woodby*, 385 U.S. 276; *Addington*, 441 U.S. 418; *Santosky*, 455 U.S. 745; *Foucha*, 504 U.S. 71.

8        Yet the *Joseph* standard subjects an alien to detention based on a standard of proof far *less*

9    favorable to the alien than the preponderance-of-the-evidence standard that the Supreme Court

10    held *inadequate* in its standard-of-proof cases.  Under *Joseph*, the alien must remain locked up

11    unless *he* can prove that the government is "substantially unlikely to prevail" on any charge of

12    removability that would implicate mandatory detention - which is tantamount to *inverting* the

13    law's most demanding proof standard ("beyond a reasonable doubt") and deploying it *against* the

14    individual whose physical liberty is at stake.

15        If the preponderance standard fails to pass constitutional muster in situations like this one,

16    then, *a fortiori*, the *Joseph* standard cannot withstand the slightest constitutional scrutiny.

17    Because it is so heavily skewed toward the government's side, the *Joseph* standard inevitably

18    will result in the erroneous detention of many lawful permanent residents who ultimately will be

19    found not subject to mandatory detention, but who cannot carry the onerous burden of proving

20    that the government is "substantially unlikely [to] prevail" in removal proceedings.  Yet these are

21    some of the aliens *least* likely to present a flight risk because they have a real hope of prevailing -

22    and of thereby preserving their hard-won and valuable status as lawful permanent residents - if

23    they see their removal proceedings through to the end.  Likewise, they are the aliens *most* likely

24    to win release if granted an individualized bond hearing.  Consequently, the Court must find that

25    a higher evidentiary standard undoubtedly will render *Joseph* hearings more accurate than they

26    presently are under the wildly skewed *Joseph* standard.

27

28

3.    Governmental Interest And Potential Burden.

This prong *of Mathews* asks the Court to identify the governmental interests at stake in a *Joseph* hearing and to assess whether a standard of proof "more strict than" the *Joseph* standard is consistent with those interests. *Santosky*, 455 U.S. at 766.

The skewed nature and gross inaccuracy of the *Joseph* standard cannot be justified by simply citing the legislative purposes behind § 1226(c). According to the *Demore* decision, the statute has two such purposes: (1) "preventing deportable aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, [they] will be successfully removed," 538 U.S. at 528; and (2) preventing criminal aliens who remain in the United States from committing additional crimes before being removed. *Id.* at 518.

But those governmental interests are considerably less compelling here than they were in *Demore*. The alien in *Demore* had **conceded** deportability on grounds that subjected him to mandatory detention.[14] Mr. Guido's case is altogether different. He does *not* concede that he "is deportable" on a ground that would subject him to mandatory detention, and he is armed with sophisticated and substantial arguments against removal. Indeed, before the BIA rendered its decision in *Matter of Tobar-Lobo*, 24 I & N Dec. 143 (BIA 2007), the IJ had expressly rejected the government's contention that Mr. Guido's misdemeanor conviction under Cal. Penal Code § 290(a)(1)(D) is a crime involving moral turpitude.[15] Moreover, the *Tobar-Lobo* decision drew a vigorous dissent. It is far from clear, therefore, that the U.S. Court of Appeals for the Ninth

---

[14]   *See Demore*, 538 U.S. at 531 ("The INS detention of respondent, a criminal alien who has *conceded that he is deportable* . . . is governed by" cases upholding detention during removal proceedings) (emphasis added); *id.* at 523 n.6 ("As respondent has *conceded that he is deportable* for purposes of his habeas corpus challenge to § 1226(c) at all previous stages of this proceeding.... *we decide the case on that basis."*) (emphases added); *see also Gonzalez v. O'Connell*, 355 F.3d 1010, 1019 (7th Cir. 2004) (observing that *"Kim's* holding was expressly premised on" fact that Kim had conceded deportability).

[15]   If his conviction is not, in fact, a CIMT, then Mr. Guido is eligible to keep his green card through the process of readjusting with a 212(c), 8 U.S.C. § 1182(c), waiver. *See Matter of Azurin*, 23 I & N Dec. 695 (BIA 2005). Mr. Guido has, therefore, a huge incentive to fight his removal case up through the Ninth Circuit.

1  Circuit will agree that Mr. Guido "is deportable" for his misdemeanor conviction under Cal.

2  Penal Code § 290(a)(1)(D).  To fight his case to the Ninth Circuit, however, will take nearly two

3  years.  Thus, the governmental interests that justified mandatory detention in Kim's case have a

4  much weaker claim on Mr. Guido's freedoms.  If due process "is not a technical conception with

5  a fixed content unrelated to time, place and circumstances" - if indeed it is "flexible and calls for

6  such procedural protections as the particular situation demands" - then the Court's *Mathews*

7  analysis must take account of the important differences between an alien like Kim who concedes

8  removability on grounds that would subject him to mandatory detention and one like Mr. Guido

9  who does not.  *Mathews*, 424 U.S. at 334 (citations and quotation marks omitted).

10  Moreover, Supreme Court precedent demonstrates that the policy concerns cited in *Demore*,

11  in and of themselves, will not dictate the standard of proof required in a civil proceeding that

12  threatens a serious deprivation of individual liberty.  For example, in *Woodby*, the Court

13  imposed a "clear, unequivocal, and convincing evidence" standard of proof even though Woodby

14  admitted that, after being admitted to this country, she had engaged in prostitution - a crime then

15  deemed sufficiently antisocial that Congress had designated it a deportable offense.  *See* 385 U.S.

16  at 280 n.5.  In *Addington*, the Supreme Court imposed the "clear and convincing evidence"

17  standard of proof even though the state maintained that Addington "suffered from serious

18  delusions, that he often had threatened to injure both of his parents and others, that he had been

19  involved in several assaultive episodes while hospitalized and that he had caused substantial

20  property damage both at his own apartment and at his parents' home."  441 U.S. at 420-21.  Each

21  of these cases involved governmental interests that were compelling, or that were deemed to be

22  so at the time that the Supreme Court imposed a heightened standard of proof.  Yet none of those

23  interests could override society's countervailing interest in fairly and appropriately allocating the

24  risk of error in a civil proceeding that threatened a serious deprivation of individual liberty.

25  Finally, the administrative costs of adopting a higher standard of proof in *Joseph* hearings

26  would be minimal.  No new hearing or procedure would be required - merely the use of a

27  different but hardly novel legal standard.  Under Mr. Guido's standard, an alien is "not properly

28

included" within the category of aliens subject to mandatory detention under § 1226(c), and

therefore should be granted an individualized bond hearing, if he presents a substantial argument

against any charge of removal that implicates mandatory detention. "[S]uch a standard

adequately conveys to the factfinder the level of subjective certainty about his factual conclusions

necessary to satisfy due process." *Santosky*, 455 U.S. at 769.[16] Although Mr. Guido's proposal

favors the detainee, that is appropriate for at least two reasons. *First*, as we have seen, the

Supreme Court has repeatedly tipped the scales in the individual's favor when "the individual

interests at stake" in a civil proceeding "are both 'particularly important' and 'more substantial

than mere loss of money.'" *Santosky*, 455 U.S. at 765 (citation omitted). *Second*, winning a

*Joseph* hearing under Mr. Guido's standard will *not* hand the alien the keys to his detention cell.

All it will do is qualify him for an individualized bond hearing at which he can try to persuade an

immigration judge that he poses no risk of flight or danger to the community.

Thus, a proper *Mathews* analysis demonstrates that errors resulting in serious and potentially

lengthy deprivations of physical liberty are made far more likely by use of the *Joseph* standard,

and are not justified by any countervailing governmental interest in detaining lawful permanent

residents who contest removal.

**B.    To Avoid the Serious Due Process Concerns Described Above, the Court Must Construe the Term "is Deportable" in § 1226(c) as Encompassing Only Those Aliens Who Have No Substantial Argument Against The Charges of Removability That Trigger Mandatory Detention.**

"[A]n Act of Congress ought not be construed to violate the Constitution if any other

possible construction remains available." *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490,

500 (1979) (citing *Murray v. The Charming Betsy*, 2 Cranch. 64, 118, 2 L. Ed. 208 (1804)).

---

[16] Like Judge Tashima, Justice Breyer has suggested that an alien held in mandatory detention under § 1226(c) should be permitted to seek release on bail "so long as [his] legal arguments [against removal] are neither insubstantial nor interposed solely for purposes of delay[.]" *Demore*, 538 U.S. at 577 (Breyer, J., concurring in part and dissenting in part). And in *Gonzalez v. O'Connell*, 355 F.3d 1010 (7th Cir. 2004), the Seventh Circuit observed that *Kim* "left open the question of whether mandatory detention under § 1226(c) is consistent with due process when a detainee makes *a colorable claim* that he is not in fact deportable." *Id.* at 1019-20 (emphasis added).

1  Indeed, "every reasonable construction must be resorted to, in order to save a statute from

2  unconstitutionality,' unless those saving constructions are "plainly contrary to the intent of

3  Congress." *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568,

4  575 (1988) (internal citation and quotation marks omitted).[17]

5      Thus, the Court must construe § 1226(c) to avoid the serious constitutional concerns

6  described above.  Fortunately, however, a saving construction is readily available and may

7  actually be compelled by the plain language of § 1226(c).  As Judge Tashima noted in *Tijani*,

8  "8 U.S.C. § 1226(c) tells the Attorney General to 'take into custody any alien who . . . *is*

9  deportable,' not one who may nor may not, fall into that category." *Tijani*, 430 F.3d at 1247

10 (Tashima, J., concurring)(emphasis in original).  Thus, "[o]nly those immigrants who could not

11 raise a 'substantial' argument against removability [on grounds that would trigger § 1226(c)(1)]

12 should be subject to mandatory detention." *Id.*

13 **III. BECAUSE THE ATTORNEY GENERAL DID NOT TAKE HIM INTO CUSTODY
       UNTIL YEARS AFTER HIS ARREST AND RELEASE ON HIS MISDEMEANOR**
14     **CHARGE UNDER CAL. PENAL CODE § 290(a)(1)(D), MR. GUIDO IS NOT
       SUBJECT TO MANDATORY DETENTION.**
15

16     The term "when released" has been the subject of interpretation in several previous cases.

   As the court stated in *Pastor-Camarena v. Smith*, 977 F. Supp. 1415 (W.D. Wash. 1997):
17

18     The plain meaning of this language ["when the alien is released"] is that it applies
       immediately after release from incarceration, not to aliens released many years earlier. . . . In
       this context, it was arbitrary and capricious for respondents to interpret the language. . . to
19     include aliens, like petitioner, who were released from incarceration many years before

20  ─────────────────────────

21     [17]  The constitutional-doubt doctrine often arises in cases challenging an executive
   agency's statutory interpretation, as embodied in a regulation or agency adjudication. In such
22 cases, the doctrine of constitutional doubt takes precedence over the familiar *Chevron* doctrine of
   judicial deference to reasonable agency interpretations. *See DeBartolo*, 485 U.S. at 574; *cf.*
23 *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 & n.9
   (1984). As the Ninth Circuit recently observed, "*Chevron* deference is limited by the
24 reasonableness of the agency's interpretation, and we must attempt to preserve the statute's
   constitutionality even if such a reading conflicts with the agency's interpretation." *Flores-Chavez*
25 *v. Ashcroft*, 362 F.3d 1150, 1162 (9th Cir. 2004). The same principles of course apply to agency
26 interpretations of the INA. Thus, the Supreme  Court has "read significant limitations into ...
   immigration statutes in order to avoid their constitutional invalidation." *Zadvydas v. Davis*, 533
27 U.S. 678, 689 (2001).

28

1    coming into the custody of the INS for deportation proceedings.

2    977 F.Supp. at 1417-1418. Thus, the court ordered that an individualized bond hearing be held

3    before the immigration judge. In *Rivera v. Demore*, No. C99-3042-THE, 1999 WL 521177, at

4    *4 (N.D. Cal. July 13, 1999), this Court followed *Pastor-Camarena*, noting:

5        By its terms section 236(c) gives the INS a strong incentive to detain criminal aliens
         immediately after their release from criminal custody: if taken into INS custody
6        immediately, the mandatory detention rules apply, precluding the risk of flight arising from
         release on bond and avoiding altogether the administrative burden and expense of bond
7        hearings.

8    Thus, "since Rivera was released from state criminal incarceration in April 1995, over three years

9    before he was taken into custody by the INS in May 1998, the prohibitions on release of aliens

10   taken into custody under section 236(c)(1) do not apply to him." *Rivera v. Demore*, No. C99-

11   3042-THE, 1999 WL 521177, at *4 (N.D. Cal. July 13, 1999). Similarly, in *Alikhani v. Fasano*,

12   70 F. Supp 2d 1124 (S.D. Cal. 1999) the court noted that the word "when" is defined as "just

13   after the moment that." 70 F. Supp. 2d at 1130, quoting *Webster's Third New International*

14   *Dictionary* (3d ed. 1976)). Thus, "the mandatory detention of aliens 'when' they are released

15   requires that they be detained at the time of release." *Id. See also Velasquez v. Reno*, 37 F. Supp.

16   2d 663, 672 (D. N.J. 1999) ("This court cannot simply ignore the plain language of the statute

17   which provides that an alien is to be taken into custody 'when' the alien is released").

18       Moreover, this is not the first time that the "when released" - type language has been

19   interpreted by the Federal courts. The Anti-Terrorism and Effective Death Penalty Act of 1996

20   (AEDPA), Pub. L. No. 104 132, 110 Sat. 279, which became effective April 24, 1996,

21   established a rule for the mandatory detention of certain individuals convicted of crimes "upon

22   release" from incarceration. Section 242(a)(2) of the Immigration and Nationality Act, 8 U.S.C.

23   § 1252(a)(2), as amended by 440(c) of the AEDPA, effective April 24, 1996 provided:

24       The Attorney General shall take into custody any alien convicted of any criminal offense
         covered [in specified deportation sections], upon release of the alien from incarceration,
25       [and] shall deport the alien as expeditiously as possible.

26   Numerous courts held that when Congress used the term "upon release," Congress meant that the

27   statute did not apply to individuals who were convicted and released, and then later arrested by

28   Petition for Writ of Habeas Corpus                    -27-

1  INS after they had been released from criminal incarceration. *See, e.g., Zabadi v. Chertoff*, 2005

2  U.S. Dist. LEXIS 31914 (N.D. Cal. 2005)(mandatory detention statute does not apply to

3  petitioner who was taken into immigration custody two years after completion of criminal

4  sentence) *Montero v. Cobb*, 937 F. Supp 88, 95 (D. Mass. 1996) (finding that the petitioner was

5  entitled to a bond hearing because not taken into custody "upon release"); *Grodzki v. Reno*, 950

6  F. Supp. 339, 342-43 (N.D. Ga. 1996) (finding that "upon release" language implies that Service

7  custody must commence within a reasonable time after release from criminal incarceration and

8  the statute therefore did not apply to petitioner, who had been released from incarceration 8 years

9  earlier); *DeMelo v. Cobb*, 936 F. Supp. 30, 36 (D. Mass. 1996) (holding that AEDPA §440(c)

10  could not, by its language, apply to aliens who were convicted and released before the statute was

11  enacted), vacated, 108 F. 3d 328 (1st Cir. 1997)(question mooted by passage of IIRIRA);

12  *Villagomez v. Smith*, No. C96-1141C, 1996 WL 622451, at 6 (W.D. Wash. July 31, 1996)

13  (holding that the language of AEDPA §440(c) supported the conclusion that it did not apply to

14  aliens convicted and released prior to its enactment).

15      If Congress had intended to make § 1226(c) applicable to individuals regardless of when

16  they were released or when they were taken into custody by the Service, it could easily have

17  included language to that effect. *See McCarthy v. Branson*, 500 U.S. 136, 140 (1991)

18  (presuming that Congress is familiar with judicial opinions interpreting particular language

19  relating to the subject matter when it again selected and enacted such language). The decision

20  not to include such language reveals an intent that § 1226(c) does not apply to individuals who

21  have been released from criminal incarceration years earlier and are apprehended by DHS in the

22  community at large.

23      This court has previously held that "the plain meaning of this language ["when released"] is

24  that it applies immediately after release from incarceration, not to aliens released many years[s]

25  earlier." *Rivera v. Demore*, No. C99-3042-THE, 1999 WL 521177, at *4 (N.D. Cal. July 13,

26  1999). For this reason, and for the reasons explained above, this court should enter an order

27  declaring that Mr. Guido is not subject to mandatory detention under § 1226(c).

28

1

## CONCLUSION

2    For the foregoing reasons, the Court should declare the BIA erred in concluding that Mr.

3 Guido is subject to mandatory detention.  Accordingly, the Court should issue a writ of habeas

4 corpus directing Respondents to give Mr. Guido a bond hearing under INA § 236(c), 8 U.S.C. §

5 1226(c), or a *Joseph* hearing that comports with due process and the plain language of INA §

6 236(c), 8 U.S.C. § 1226(c).

7

8 Dated: July 27, 2007        Respectfully submitted,

9                LAW OFFICE OF ROBERT B. JOBE

10

11

12                Robert B. Jobe
                  550 Kearny Street, Suite 200

13                San Francisco, CA 94108
                  (415) 956-5513 (phone)

14                (415) 840-0308 (fax)

15                Attorney for Petitioner

16

17

18

19

20

21

22

23

24

25

26

27

28